**JON N. and Teresa N., personally and as guardians for Patricia N.,**
Plaintiffs,

v.

**BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,**
Defendant.

Civil Action No. 08–10776–JLT.

United States District Court,
D. Massachusetts.

Feb. 16, 2010.

Jonathan M. Feigenbaum, Phillips & Angley, Boston, MA, James L. Harris, Jr., Bradley R. Sidle, Brian S. King, Attorney at Law, Salt Lake City, UT, for Plaintiffs.

Joseph D. Halpern, Blue Cross Blue Shield Law Dept., Boston, MA, Robert G. Wing, Prince Yeats & Geldzahler, Salt Lake City, UT, for Defendant.

## MEMORANDUM

TAURO, District Judge.

### I. *Introduction*

This action challenges a denial of health insurance benefits under an employee welfare benefits plan, established pursuant to the Employee Retirement Income Security Act of 1974[1] ("ERISA"). Plaintiffs Jon N. and Teresa N. are parents and legal guardians of Patricia N. ("Patricia" or "Tricia"), a minor, who is insured under a health insurance plan sponsored by her father's employer and administered by Defendant Blue Cross Blue Shield of Massachusetts ("Blue Cross"). Plaintiffs allege that Blue Cross improperly denied reimbursement for inpatient substance abuse and mental health treatment that Patricia received at the Island View Residential Treatment Center ("Island View") from August 30, 2006, to June 22, 2007. For the following reasons, *Defendant's Motion for Summary Judgment* [# 50] is ALLOWED and *Plaintiffs' Motion for Summary Judgment* [# 57] is DENIED.

### II. *Background*[2]

#### A. *Patricia's Medical History and Treatment*

Prior to her admission at Island View, Patricia had a long history of emotional and behavioral health issues. To address these problems, she received, beginning in 2004, individual outpatient therapy from Amy Lilavois, a Licensed Mental Health Counselor. But in June of 2006, Ms. Lilavois observed that, despite therapy and medication, Patricia's behavior had become more risky. Ms. Lilavois therefore recommended residential treatment. An educational consultant who evaluated Patricia's treatment history agreed with this recommendation. And so, Plaintiffs enrolled Patricia in Second Nature Entrada Wilderness Program ("Second Nature"). There, from June 29, 206 to August 29, 2006, she was treated for Major Depressive Disorder, Bulimia Nervosa, Alcohol Dependence, Marijuana Abuse, Oppositional Defiant Disorder, and Parent–Child Relational Problem.

The Confidential Psychological Assessment Report completed by Second Nature on August 8, 2006, states that "Tricia denies any suicidal ideation ... Tricia denies any obsessions or compulsions, paranoia, auditory or visual hallucinations, racing thoughts, excessive energy, attentional difficulties, as well as grandiosity."[3] Nonetheless, two licensed clinical psychologists, who treated Patricia at Second Nature, recommended additional treatment at a secure residential facility upon her discharge

---

**1.** 29 U.S.C. § 1001, et. seq.

**2.** All facts presented are drawn from the Administrative Record [hereinafter "AR"], as that is the only factual record this court is permitted to review. *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 518 (1st Cir.2005).

**3.** AR 68.

from the program. Based on these recommendations, Plaintiffs procured residential treatment for Patricia at Island View, where she remained from August 30, 2006, until June 22, 2007. Patricia's treatment at Island View included individual therapy, group therapy, and family therapy, substance abuse counseling, academic and recreational programs, and ongoing medication evaluation and management.

Clinicians at Island View conducted a Psychiatric Evaluation upon Patricia's admission, which confirmed Second Nature's report that Patricia "has had no recent cutting or self-harm behavior. In the remote past she has had some suicidal ideation, however, has none currently and has never made any suicide attempt.... [C]urrently feels mildly depressed."[4] The Psychiatric Evaluation also states that Patricia's "mood is mildly depressed and affect is congruent. Her thought content is without hallucinations, delusions, suicidal or homicidal ideation.... The resident denies a desire to hurt or kill herself and there are no substantial self-harm, i.e. cutting, or suicidal risk factors present. The resident is oriented to person, time and place, sober, non-psychotic, attentive and cooperative."[5]

A Suicide Assessment completed at Island View on August 30, 2006, reports no suicide attempts or thoughts of suicide.[6] The Psychiatric Admitting Note similarly records "[n]o suicide attempt" and "[t]hought content without hallucinations/delusions, suicidal ideation, homicidal ideation. Mood mildly depressed, affect

congruent!"[7] Progress Notes for August 30, 2006, state that "Tricia indicated that she felt like she was no risk for attempting suicide or self-harm at this time. She indicated that she was not experiencing enough stress or anxiety or depression to feel suicidal."[8]

B. *Patricia's Coverage Under the Plan*

Patricia is a participant in her father's health benefits plan (the "Plan"), which Blue Cross funds and administers. The Plan includes a provision for "Mental Health and Substance Abuse Treatment," which covers "biologically-based mental conditions," such as major depressive disorder, and other mental conditions, including drug addiction and alcoholism.[9]

Under the proper circumstances, the Plan covers inpatient hospital care, acute or subacute residential treatment, partial hospitalization, and intensive outpatient treatment, along with routine outpatient treatment.[10] But the contract between Blue Cross and Plaintiff Jon N., the Blue Care Elect Subscriber Certificate, specifies that such coverage will only be provided for those services that are "medically necessary."[11]

Under the terms of the Subscriber Certificate, "Blue Cross and Blue Shield decides which covered services are medically necessary."[12] To qualify, all services must be (1) "[c]onsistent with the diagnosis and treatment of [the participant's] condition"; (2) "[e]ssential to improve [the participant's] health outcome and as beneficial as

---

4. AR 111.

5. AR 114. *See also* AR 178 ("denies she is currently feeling suicidal .... has never attempted suicide").

6. AR 160, 195 ("Level of Risk: None = no suicidal ideation.").

7. AR 182, 183.

8. AR 196, 516.

9. AR 36–37.

10. AR 42–45.

11. AR 14–15, 25.

12. AR 14–15.

any established alternatives covered by this contract"; (3) "[a]s cost effective as any established alternatives"; and (4) "[f]urnished in the least intensive type of medical care setting required." Importantly, the Plan grants Blue Cross "full discretionary authority to make decisions regarding eligibility for benefits," as well as "to conduct medical necessity review." [13]

In evaluating whether residential psychiatric care is medically necessary to treat a participant's condition, Blue Cross physician reviewers use the initial review InterQual Behavioral Health Criteria ("InterQual Criteria"). The InterQual Criteria are utilization review guidelines used widely throughout the industry to determine the level of care required by an individual plan participant.[14] The InterQual Criteria contain initial review guidelines ("InterQual Initial Review Criteria"), which physician reviewers use to determine whether the participant qualifies for admission to a particular type of treatment facility, and concurrent review guidelines ("InterQual Concurrent Review Criteria"), which physician reviewers use to determine whether a participant who initially qualified for admission to a treatment facility qualifies for continued care in the facility.[15] Additionally, they include separate subsets of criteria by which to evaluate the necessity of different levels of inpatient treatment. Listed in order of decreasing intensity, those levels are subacute psychiatric care, psychiatric residential treatment, and psychiatric therapeutic group home.[16]

When Blue Cross denies a claim, the Plan provides members with the right to seek external review by the Massachusetts Department of Public Health's Office of Patient Protection ("OPP"), pursuant to M.G.L. c. 176O. Under the terms of the Subscriber Certificate, any decision rendered by way of the OPP external review process "will be accepted as the final decision" on coverage, once it has been sought by the participant.[17]

C. *Review of Plaintiffs' Claims for Reimbursement*

On August 31, 2006, Plaintiffs requested authorization from Blue Cross for Patricia's treatment at Island View. Dr. William Lesner, a board-certified Child and Adolescent psychiatrist, reviewed Plaintiffs' claim on behalf of Blue Cross. After speaking with a nurse at Island View and reviewing the relevant clinical notes, Dr. Lesner concluded in a letter to Plaintiffs dated September 5, 2006, that Patricia met the criteria for treatment in an outpatient setting, but that subacute residential treatment, such as that provided by Island View, was not medically necessary.

In a letter dated November 20, 2006, Mary Covington, Plaintiff Jon N.'s authorized representative, appealed Blue Cross' denial of benefits and provided additional medical records in support of the claim. A second Blue Cross physician reviewer, Dr. Kerim Munir, reviewed the original clinical notes, as well as the supplemental medical records, and upheld the initial decision denying coverage. Dr. Munir similarly communicated this decision to Plaintiffs, informing them that, although Blue Cross did not find subacute residential treatment to be medically necessary for Patricia's condition, Blue Cross would authorize treatment in an outpatient setting.

Plaintiffs again appealed the denial of benefits on January 19, 2007, and request-

13. AR 2.

14. AR 4, 8.

15. AR 43E.

16. AR 285–86.

17. AR 62.

ed that Blue Cross provide them with the physician reviewer's opinion, clinical rationale, and the reasons for the denial in relation to the InterQual Criteria. Blue Cross consulted with a third physician reviewer, Dr. Elyce Kearns, who also determined that "[t]he member does not meet criteria for admission to the Acute Residential treatment level of care also known as psychiatric subacute care."[18] Accordingly, Dr. Kearns upheld the denial of coverage. On January 30, 2007, a Case Specialist in Blue Cross' Grievance Program followed up with a letter explaining the reasons for Dr. Kearns' decision.

On February 9, 2007, Blue Cross received two additional doctors' letters from Plaintiffs, providing supplemental information pertaining to Patricia's treatment. Blue Cross treated this supplementary information as constituting an additional member appeal and once again had Dr. Lesner, the initial reviewing physician, review Plaintiffs' claim for coverage. Dr. Lesner reviewed all of the information provided up to that time and again concluded that Patricia did not meet the InterQual Criteria for subacute residential treatment.

On February 19, 2007, Mary Covington sought external review of the coverage denials by OPP. OPP assigned the appeal to Maximus CHDR ("Maximus"), an independent external review agency located in Virginia, with offices in New York and throughout the country. Maximus provides utilization review services for numerous government clients, including federal agencies such as the Centers for Medicare and Medicaid Services, the Office of Personnel Management, the Department of Defense, and the Department of Veterans Affairs, as well approximately thirty state regulatory agencies. As required by M.G.L. c. 176O, the assignment to Maximus was random.

On March 20, 2007, a Blue Cross Case Specialist sent Maximus the complete file for Patricia's grievance, along with a cover letter summarizing the case, as required by OPP regulations. Maximus assigned the case to one of its contracted psychiatrist reviewers, a practicing physician who is board-certified in adult psychiatry and child and adolescent psychiatry with experience in treatment of patients with Patricia's diagnoses.[19]

Between January 1, 2006 and December 31, 2008, the Maximus physician reviewer assigned to Patricia's case reviewed six Blue Cross cases in Massachusetts. He reversed Blue Cross in two of those cases, partially reversed in one, and affirmed in three. He completed eleven independent medical reviews for other Massachusetts health plans during the same time period. In those cases he reversed four times, partially reversed twice, and affirmed five times.[20] A Quality Assurance review of his work by a Maximus Medical Director for the same period revealed no errors or problems.[21] Notably, the only compensation a Maximus reviewer receives for his work in a case like this is a flat fee of $150.00 per review.

The Maximus reviewer upheld the denial of coverage, concluding, as had all of the other reviewers, that treatment at a subacute residential level of care was not medically necessary for Patricia. "Although a seriously disturbed individual obviously in need of psychiatric treatment I believe that treatment could have been

---

**18.** AR 305.

**19.** Decl. of Joseph Halpern in Support of Def.'s Mem. Mot. Summ. Judg., Ex. C, Naughton Dep., Ex. 2, 735–46.

**20.** Decl. of Joseph Halpern in Support of Def.'s Mem. Mot. Summ. Judg., Ex. C, Naughton Dep., 43–44.

**21.** *Id.* at 35–39.

rendered appropriately [to Patricia] in a less restrictive manner. I concur with other reviewers." [22] On April 3, 2007, Blue Cross informed Plaintiffs of OPP's decision to uphold the denial of coverage based on Maximus' independent review.

On August 8, 2007, Blue Cross received a provider appeal from Island view that included additional medical records, updating treatment through May 31, 2007. On August 21, 2007, Dr. Lesner reviewed the prior clinical notes and the medical record as supplemented by Island View, and decided to send the case out for external same specialty standard review at MCMC Peer Review Analysis ("MCMC"), an external independent review agency. MCMC's review was conducted by Dr. Danielle C. Suykerbuyk, who is board certified in Psychiatry & Neurology/ Psychiatry and Child and Adolescent Psychiatry & Neurology, and is an actively practicing specialist in those areas. Dr. Suykerbuyk was asked to determine first whether Patricia met the InterQual Initial Review Criteria for admission to psychiatric subacute care and, if so, whether she met the InterQual Concurrent Review Criteria for continued care throughout the intervention. Dr. Suykerbuyk found that Patricia did not meet the InterQual Initial Review Criteria for admission to subacute residential treatment, but that her symptoms did qualify for care at an outpatient level. Because Dr. Suykerbuyk concluded that the Plan did not provide coverage for Patricia's care based on the initial review criteria, she found it unnecessary to apply the concurrent review criteria to determine whether there might be coverage for continued care. Based on this final external review, Dr. Lesner informed Plaintiffs and Island View that Blue Cross remained firm in its denial of coverage for Patricia's residential treatment.

## III. Discussion

### A. Standard of Review

■■■ In an ERISA action of this nature, review is "confined to the administrative record before the ERISA plan administrator" [23] and, thus, "the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." [24] In this context, "summary judgment is simply a vehicle for deciding the issue," and "the non-moving party is not entitled to the usual inferences in its favor." [25]

■■■ The Supreme Court set out the standards of decision for an ERISA denial of benefits action in *Firestone Tire & Rubber Co. v. Bruch*.[26] The appropriate standard of review depends on whether the Plan grants the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." [27] If the administrator lacks discretion under the Plan, a court must review the decision de novo.[28] If the Plan grants the administrator discretion, however, a court reviews the administrator's decision under the deferential arbitrary and capricious standard.[29] But if the court deter-

---

**22.** Decl. of Joseph Halpern in Support of Def.'s Mem. Mot. Summ. Judg., Ex. C, Naughton Dep., Ex. 3, 764.

**23.** *Orndorf,* 404 F.3d at 518.

**24.** *Leahy v. Raytheon Co.,* 315 F.3d 11, 18 (1st Cir.2002).

**25.** *Orndorf,* 404 F.3d at 517.

**26.** 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

**27.** *Id.* at 115, 109 S.Ct. 948.

**28.** *Id.*

**29.** *Id.*

mines that the plan administrator operated under a conflict of interest in reviewing the participant's claim, the court must weigh such conflict as a factor in determining whether the plan administrator's denial of benefits was an abuse of discretion.[30]

■ "The threshold question, then, is whether the provisions of the employee benefit plan ... reflect a clear grant of discretionary authority to determine eligibility for benefits." [31] The Plan at issue here explicitly gives Blue Cross "full discretionary authority to make decisions regarding eligibility for benefits" and "to conduct medical necessity review." [32] The Plan further provides that "[a]ll determinations of Blue Cross and Blue Shield with respect to any matter within its assigned responsibility will be conclusive and binding on all persons unless it can be shown that the interpretation or determination was arbitrary or capricious." [33] It appears to this court, therefore, that Blue Cross's discretionary authority under the plan is abundantly clear.

Nonetheless, Plaintiffs argue that, although the terms of the contract between Blue Cross and Jon N.'s employer provide for the requisite discretionary authority, the Subscriber Certificate does not give adequate notice to participants of any grant of discretionary authority to Blue Cross. Plaintiffs, therefore, submit that the proper standard of review is de novo.[34] This court is unpersuaded by Plaintiffs'

argument. Plaintiffs' Subscriber Certificate clearly states that "Blue Cross and Blue Shield decides which covered services are medically necessary and appropriate . . . ." [35] This certainly suffices to notify participants of Blue Cross's discretion with regard to coverage determinations.[36] Accordingly, this court finds it appropriate to review the administrator's decision under the arbitrary and capricious standard of review.

■ Further, this court finds that the arbitrary and capricious standard is not affected by any conflict of interest in this case. Plaintiff argues that Blue Cross operates under a conflict of interest and, therefore, deserves less deference because Blue Cross both funds the plan and evaluates benefits claims. The Supreme Court recently clarified in *Metropolitan Life Insurance, Co. v. Glenn* that this "dual role" indeed creates a conflict of interest.[37]

In such a case, however, the conflict of interest is but one factor among many that may "act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." [38] The Court went on to note that the administrator's dual role "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." [39]

30. *Id.* (internal quotations omitted).

31. *Leahy*, 315 F.3d at 15.

32. AR at 2.

33. *Id.*

34. *See Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 584 (1st Cir.1993) (finding that an ERISA plan must comply with technical requirements relating to the delegation of discretionary authority to qualify for a deferential standard of review).

35. AR at 14–15.

36. *See Smith v. Blue Cross Blue Shield of Massachusetts, Inc.*, 597 F.Supp.2d 214, 219 (D.Mass.2009).

37. 554 U.S. 105, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008).

38. *Id.* at 2351.

39. *Id.*

■ "[C]ourts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts.... [I]n cases in which a conflict has in fact infected a benefit-denial decision, such a circumstance may justify a conclusion that the denial was itself arbitrary and capricious."[40] Importantly, however, a real conflict must exist. "[A] chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due."[41] Notably, Plaintiffs bear the burden of demonstrating that a conflict of interest has infected the denial of benefits decision under review.[42]

Blue Cross concedes that it indeed has such an structural conflict of interest, but argues that the conflict is neutralized by the fact that OPP rendered the final decision on Plaintiffs' claim. The Plan delegates decision-making authority to the external review agency selected by OPP whenever a participant invokes his right to third-party review, as Plaintiffs did here. The Plan also provides that the ensuing adjudication "will be accepted as the final decision."[43]

Plaintiffs chose to exercise their right to external review through OPP, which the Plan plainly identified as binding on the parties. Plaintiffs present no credible evidence that Maximus was affected by Blue Cross's structural conflict of interest. Maximus has no apparent affiliation with Blue Cross and reviewed Plaintiffs' claim independently, without any deference to Blue Cross's initial decision. OPP paid Maximus the standard fee dictated by its contract with the agency and Maximus' physician reviewer was, in turn, given the standard fee paid out by Maximus for such a review. Plaintiff has presented no evidence that Blue Cross controls or influences either OPP's selection of an external review agency or the external review agency's selection of its physician reviewers.

Further, even though the Plan dictates that OPP's decision will be binding on the Plaintiffs, Blue Cross commissioned a second external review of the claim after Plaintiffs submitted supplementary medical records updating treatment from the OPP review through May 31, 2007. As such, Plaintiffs have clearly "taken advantage of an external review process that is expressly designed to reduce the potentially pernicious effects of Blue Cross's structural conflict, and Blue Cross's conflict of interest has been diminished 'to the vanishing point' as a result."[44]

■ In the alternative, Plaintiffs argue that this court should review the administrator's determination de novo because the physician reviewers failed to utilize the proper criteria to evaluate the treatment received by Patricia at Island View. The InterQual Criteria include separate sets of criteria by which to evaluate the necessity of subacute psychiatric care, psychiatric residential treatment, and placement in a psychiatric therapeutic group home. The physician reviewers applied only the criteria relating to subacute treatment, but did not apply criteria to determine whether residential care or a therapeutic group home might have been medically necessary for Patricia.

---

**40.** *Denmark v. Liberty Life Assurance Co. of Boston,* 566 F.3d 1, 9 (1st Cir.2009) (citing *Glenn,* 128 S.Ct. at 2351).

**41.** *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan,* 402 F.3d 67, 74 (1st Cir.2005).

**42.** *Id.*

**43.** AR 62.

**44.** *See Smith,* 597 F.Supp.2d at 220 (quoting *Metropolitan Life Insurance, Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2351, 171 L.Ed.2d 299 (2008)).

Plaintiffs contend that this was an abuse of Blue Cross's discretion because (1) Massachusetts Mental Health Parity Law requires Blue Cross to provide coverage for intermediate inpatient care at levels less intensive than subacute treatment and (2) the care that Patricia received at Island View was in fact less intensive than subacute treatment. Defendant, on the other hand, submits that the physician reviewers appropriately evaluated Patricia's treatment using only the subacute care criteria because (1) Massachusetts law does not require Blue Cross to provide coverage for residential treatment other than subacute care and partial hospitalization and (2) in any case, the care provided by Island View was indeed subacute, based on a comparison of the services provided with the InterQual Criteria's description of subacute care.

Plaintiffs rely on the language of Bulletin 2003–11 from the Massachusetts Commissioners of Mental Health and Insurance, entitled "Intermediate Care as part of Mental Health Parity Benefits".[45] The Bulletin states that mental health benefits must "consist of a range of medically necessary inpatient, intermediate, and outpatient services to take place in the least restrictive clinically appropriate setting.... Intermediate services include, but are not limited to, Level III community-based detoxification, acute residential treatment, partial hospitalization, day treatment, and crisis stabilization.... While no statute requires coverage for custodial residential services, Chapter 80 mandates carriers to provide intermediate

care services for the medically necessary treatment of behavioral disorders."[46]

Plaintiffs argue that this missive from the Commonwealth of Massachusetts requires Blue Cross to cover all medically necessary residential services. Defendant counters that Blue Cross provides the range of coverage contemplated by the Bulletin by providing benefits for inpatient hospital care, acute or subacute residential treatment, partial hospitalization, and intensive outpatient treatment.[47]

This court agrees with Defendant. Even assuming that the Bulletin is binding law with which Blue Cross must comply, the Bulletin's plain language only appears to require coverage for a range of mental health services that includes *some* form of intermediate residential care. Blue Cross does so by providing coverage for medically necessary subacute residential treatment, partial hospitalization, and intensive outpatient care. This court cannot reasonably interpret the Bulletin to require Blue Cross to provide coverage for *all* forms of intermediate care.

Notably, the range of coverage provided by the Plan is implicitly approved by the Commissioner of the Massachusetts Division of Insurance through its accreditation of Blue Cross as a health benefits carrier.[48] Given that the Plan covers intermediate care in the form of acute or subacute residential treatment, partial hospitalization, and intensive outpatient care,[49] the physician reviewers appropriately applied only the InterQual Criteria for subacute care. It is Blue Cross's policy to consider psychiatric subacute care, partial hospital-

45. *See,* Pl.'s Mem. Supp. Summ. Judg., Ex. A, Division of Insurance Regulatory Information Bulletin 2003–11.

46. *Id.*

47. *See* AR 42–45 (describing the inpatient services for which Blue Cross provides coverage).

48. *See, e.g.,* M.G.L. c. 176B § 4; 211 CMR 52.06(4), 52.96(7), 53.13(8).

49. *See* Pl.'s Mem. Summ. Judg., Ex. A, Horn Dep., 71–73.

ization, and intensive outpatient care and then to authorize coverage for the least restrictive clinically appropriate setting. Here, the physician reviewers determined that Patricia's case required intensive outpatient treatment, but nothing more. Blue Cross was not further required to consider whether Patricia qualified for other types of intermediate care for which Blue Cross does not provide coverage.

Moreover, even assuming that the Bulletin relied on by Plaintiffs indeed required Blue Cross to cover lesser levels of inpatient treatment, this court is persuaded that the care Patricia received at Island View (the care for which coverage was requested) was in fact subacute psychiatric care.

Plaintiffs have presented no evidence to rebut Defendant's argument that Patricia's treatment qualified as subacute psychiatric care under the definition provided by the InterQual Criteria. The InterQual Criteria describe subacute care as involving intensive therapies, behavior modification, psychopharmacology, nursing assessment and intervention, diagnostic evaluation, and educational planning,[50] all of which were part of Patricia's treatment program at Island View.[51] In contrast, the guidelines describe the two lesser levels of residential care without reference to any of these services.[52] Additionally, the levels of residential care are distinguished within the InterQual Criteria by the frequency of therapy provided: a "residential treatment center" needs provide therapy only three times per week, whereas subacute psychi-

atric care must include at least five therapy sessions per week.[53] Patricia received seven therapy sessions a week, in the form of five group, one individual, and one family therapy session.[54]

In light of the evidence that Patricia indeed received subacute care at Island View, this court finds Blue Cross's decision to determine coverage for the services provided based on the InterQual Criteria for subacute care to be entirely appropriate.

Based on the foregoing, this court reviews Blue Cross's decision under the arbitrary and capricious standard.

### B. Substantial Evidence

■■■■■ "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the [administrator]."[55] Review is deferential, and the administrator's decision must be upheld as long as "it is reasoned and supported by substantial evidence."[56] "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."[57] The only issue for the court is whether the administrator's denial of benefits is irrational, with any doubts resolved in favor of the administrator.[58] Viewed in light of this deferential standard, this court finds that substantial evidence supports Blue Cross's decision to deny Plaintiffs reimbursement for Patricia's residential treatment at Island View.

---

50. See, Pl.'s Mem. Summ. Judg., Aff. of Brian King, Ex. C., InterQual Res., 7.

51. See Pl.'s Statement of Material Facts, ¶ 21 (citing AR 82–273).

52. Id. at 8.

53. Id.

54. AR 91.

55. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

56. Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir.2004)

57. Id.

58. Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir.2003).

 The Plan clearly covers only treatments that are "medically necessary" and "[f]urnished in the least intensive type of setting required."[59] During the review process, three licensed physicians conducted separate reviews of Plaintiffs' case on behalf of Blue Cross and determined that the subacute treatment provided to Patricia was not medically necessary. This determination was then confirmed by an independent external review commissioned by OPP and a second external review commissioned by a Blue Cross physician reviewer.

Plaintiffs argue that the observations and treatment recommendations from Patricia's treating physicians at Second Nature and Island View are entitled to greater weight than the opinions of the physician reviewers whose decisions were based solely on review of medical records. In support of this argument Plaintiffs rely on a line of case law from other districts, which suggests that when mental health is at issue an opinion based on personal examination is inherently more reliable than an opinion based on a cold record.[60]

In *Island View Residential Treatment Center v. Bluecross and Blueshield of Massachusetts*, the court rejected an identical argument and found that neither Supreme Court nor First Circuit precedent recognizes an exception, in the context of ERISA cases, to the general rule that the opinions of treating and reviewing physicians receive equal weight.[61] Further, the line of cases offered to suggest that the

opinions of treating physicians are entitled to more weight (notably, the same line of cases offered here) involves the determination of whether a claimant is disabled. In other words, the parties to those cases disputed the claimant's diagnosis, which is not at issue in an ERISA denial of benefits action.[62]

 This court does not disagree that a *diagnosis* provided by a treating physician is likely to be more reliable than one provided by a reviewing physician. In contrast, however, the process of reviewing a claim for benefits does not rely on the nuances that can be observed through personal examination of the participant. Rather, it is confined to the process of applying a standardized and narrowly defined list of qualifying criteria to the participant's particular set of symptoms, as documented by treating physicians in the participant's medical records, to determine whether a participant qualifies for coverage for certain type of treatment under the Plan. Such a mechanical process would seem to be no more or less reliable when conducted by a reviewing physician than when conducted by a treating physician.

 Blue Cross cannot arbitrarily discredit the contrary opinion of Patricia's treating physicians, but neither must Blue Cross give any special weight to a treating physician's opinion, or even explain why his opinion was not given as much weight as that of the reviewing physicians.[63] As such, the existence of five separate medical opinions supporting Blue Cross's decision

---

59. AR 14–15.

60. *See, e.g., Westphal v. Eastman Kodak Co.,* 2006 WL 1720380, 2006 U.S. Dist. LEXIS 41494 (W.D.N.Y.2006).

61. *See Island View,* 2007 WL 4589335, at *23–24, 2007 U.S. District LEXIS 94901, at *76 (citing *Nord,* 538 U.S. at 834, 123 S.Ct. 1965; *Gannon v. Metropolitan Life. Ins. Co.,* 360 F.3d 211, 214 (1st Cir.2004)).

62. *Id.*

63. See *Smith,* 597 F.Supp.2d at 219 (citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (reasoning that "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled' ")); *Island View Residential Treatment Center v. Bluecross and Blueshield*

substantially justifies Blue Cross's denial of benefits, and the contrary conclusions drawn by Patricia's treating psychologists at Second Nature and Island View are not enough to render the decision irrational.

Plaintiffs have not seriously called into question the reliability of the medical opinions of the reviewing physicians. Plaintiffs argue that the Maximus reviewers opinion lacks credibility because his license to practice was temporarily suspended twenty-nine years ago. This argument carries little weight, however, since his license was reinstated without restrictions in 1983 and he has been practicing and teaching in the field of psychiatry since that time. Moreover, even disregarding the Maximus reviewer's opinion, Blue Cross's denial of benefits is still supported by four additional medical opinions, including a second external reviewer, the independence of which has also not been questioned.

The physician reviewers utilized the InterQual Initial Review Criteria to determine whether subacute residential treatment was medically necessary for Patricia. Those criteria provide that some form of residential treatment is necessary only if the participant exhibits certain symptoms or behaviors, labeled Clinical Indications, within the week prior to admission to the residential care facility. These symptoms or behaviors must be in the form of (1) chronic or persistent danger to self or others, as evidenced by such things as self-mutilation or unmanageable aggressive behavior, (2) persistent violation of court orders, or (3) habitual substance abuse, accompanied by increasing anxiety, depressed mood, mania, or psychotic symptoms.

The reviewing doctors each concluded independently that Patricia did not exhibit any of the requisite clinical indications within the week before admission. When Patricia was discharged from Second Nature immediately prior to admission at Island View, her condition was reported to be stable. Second Nature medical staff repeatedly indicated that Patricia was not homicidal, suicidal, or a danger to herself or others. Similarly, at her admission to Island View, the admission record indicated that Patricia did not suffer any hallucinations or homicidal or suicidal ideation. Patricia herself reported upon admission that she had not recently experienced hallucinations, delusions, suicidal ideation, or destructive behavior.

Though Patricia had engaged in some self-mutilation, aggressive behaviors, and substance abuse in the past,[64] there is no indication from any source that she had displayed such behaviors within the week prior to admission as required by the InterQual Criteria. In short, the medical personnel at both Second Nature and Island View and Patricia herself specifically ruled out the very symptoms that would have qualified Patricia's treatment as "medically necessary".

Moreover, the InterQual Initial Review Criteria require that the participant have been discharged or transferred from a psychiatric hospital within twenty-four hours prior to admission to an inpatient subacute treatment facility.[65] In this case, Patricia entered Island View immediately upon leaving Second Nature, which was neither a hospital nor a subacute treatment center. Accordingly, even if the reviewers had determined that Patricia met the Clinical Indications criteria, they would have nonetheless been required to find that Patricia did not satisfy the InterQual

of Massachusetts, Inc., 2007 WL 4589335, at *24–25, 2007 U.S. District LEXIS 94901, at *74 (D.Mass.2007).

64. See, e.g., AR 111, 657.

65. AR 285–86.

Initial Review Criteria for admission to a subacute psychiatric treatment facility such as Island View.

Based on the foregoing, this court cannot conclude that Blue Cross's decision to deny coverage for Patricia's treatment at Island View was irrational.

IV. *Conclusion*

For the foregoing reasons, *Defendant's Motion for Summary Judgment* [# 50] is ALLOWED and *Plaintiff's Motion for Summary Judgment* [# 57] is DENIED.

AN ORDER HAS ISSUED.

### ORDER

For the reasons set forth in the accompanying memorandum, Defendant's Motion for Summary Judgment [# 50] is ALLOWED and Plaintiffs' Motion for Summary Judgment [# 57] is DENIED. This case is DISMISSED.

IT IS SO ORDERED.